**Lynwood LESIKAR and Harriet Lewis Lesikar, Appellants,**

v.

**Jenny Lou Lewis RAPPEPORT, et al., Appellees.**

**No. 06–98–00126–CV.**

Court of Appeals of Texas, Texarkana.

Submitted April 20, 2000.

Decided Sept. 12, 2000.

Opinion Granting Appellee's Motion for Rehearing and Overruling Appellants' Motion for Rehearing Dec. 6, 2000.

**290**

S. Gary Werley, Law Office of S. Gary Werley, Fort Worth, Gregory D. Smith, Ramey & Flock, Tyler, Alison H. Moore, Beth D. Bradley, Jacquelyn A. Chandler, Thompson, Coe, Cousins & Irons, Dallas, for appellants.

Jerry S. Harris, David R. Watson, Harbour, Smith, Harris & Merritt, Longview, for appellees.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

Lynwood and Harriet Lesikar appeal from an adverse judgment in Jenny Rappeport's suit against them to impose a constructive trust and recover damages for fraud and breach of fiduciary relationship.

In 1935, H.G. Lewis bought the working interest in the T.W. Lee oil lease located in Longview, Texas, and assigned half of the interest to J.C. Robbins. Lewis operated the entire lease under the name L & G Oil Company until his death in 1980. In 1964, Lewis and Robbins each assigned to the Clark, Thomas, Winters & Shapiro law firm of Austin, Texas (Clark, Thomas), a $\frac{1}{12}$ working interest in oil wells 2 and 5 on the lease, or collectively a $\frac{1}{6}$ interest. In the early 1970s, Lewis drilled two new wells on the lease, wells 3A and 7A. Thereafter, although the 1964 assignment to Clark, Thomas explicitly covered only wells 2 and 5, Lewis paid Clark, Thomas for oil produced and billed the firm for operating expenses as though it owned a $\frac{1}{6}$ working interest not only in wells 2 and 5, but also in wells 3A and 7A.

In 1980, Lewis died leaving a will that named his two daughters, Jenny Rappeport and Harriet Lesikar, co-independent executrices of his estate. In his will, Lewis gave Jenny and Harriet each an undivided fifty percent interest in his estate for life with remainders to their children. Among Lewis's assets at his death was his

one-half interest in the T.W. Lee lease, which the estate, through Jenny and Lewis's widow, Fay Lewis, continued to operate under the name L & G Oil Company. In 1985, Clark, Thomas determined that it had no assignment to it of an interest in wells 3A and 7A and notified L & G Oil Company of that fact. An L & G employee wrote Clark, Thomas stating that she searched L & G's files for an assignment concerning wells 3A and 7A, but found none. Nevertheless, L & G continued to bill Clark, Thomas for operating expenses associated with wells 3A and 7A, and continued to pay the firm as though it owned an interest in those wells.

In 1992, Harriet and her husband Lynwood (Lyn) Lesikar sued Jenny, Fay, and others seeking a declaratory judgment as to each party's ownership in the Lewis estate and an accounting. In 1993, the Lesikars added Clark, Thomas as a defendant, seeking to recover under a theory of unjust enrichment, the "overpayment" the estate had made on wells 3A and 7A. In response, a Clark, Thomas attorney, Barry Bishop, contacted the Lesikars' attorney, Gary Werley. According to Bishop's testimony, he and Werley agreed that Clark, Thomas would disclaim its interest in wells 2 and 5 if Werley would drop Clark, Thomas from the lawsuit and not seek to recover the overpayment. Bishop wrote a letter to Werley describing their understanding, referred to by the parties as the "Rule 11 agreement," but Werley did not sign and return it at that time. The agreement stated only that Clark, Thomas would disclaim any interest it might have in wells 3A and 7A in exchange for the "plaintiffs," Harriet and Lyn, not pursuing their overpayment claim against the firm.

On April 14, 1994, the trial court ordered the Lewis estate closed. On July 13, 1994, Werley sent a letter to Bishop claiming Clark, Thomas owed the estate for the overpayment the estate had made on wells 3A and 7A. The next day, Werley sent Bishop a letter with a proposed assignment attached whereby Clark, Thomas would assign its interest in wells 2 and 5 to Harriet's husband Lyn alone; the letter stated that Lyn would be calling Bishop concerning a "settlement offer." On July 18, Bishop notified Jenny's attorney, Jerry Harris, about the proposed assignment, who agreed that the estate would be willing to completely settle the overpayment claim in exchange for Clark, Thomas's interest in wells 2 and 5. Despite Jenny's interest, Bishop later agreed with Werley that because the court had ordered the estate closed, the estate would be unable to settle the overpayment claim in exchange for Clark, Thomas's interest in wells 2 and 5 because that would subject the estate to ongoing liability for any third-party claims against the Clark, Thomas interest. They agreed that Lyn's settling the litigation in exchange for Clark, Thomas's interest in wells 2 and 5 would be acceptable.

In preparation for trial, Harris, on July 19, 1994, deposed the Lesikars. Lyn stated at his deposition that he had spoken to Clark, Thomas about acquiring the firm's interest in wells 2 and 5. After the deposition, Harris wrote Werley and Bishop advising them not to enter into an agreement unless Jenny was made a party to it. On August 3, Bishop amended the assignment to add provisions that, among other provisions, Lyn would indemnify Clark, Thomas not only for the overpayment but for all claims connected with wells 2 and 5, and also with wells 3A and 7A, and he sent a copy of the assignment to Werley. That same day, Werley agreed to the assignment and returned it to Bishop. A few days later, Werley signed and returned to Bishop the Rule 11 agreement that Bishop still required, and pursuant to that agreement, Werley dropped Clark, Thomas from the lawsuit. On August 9, Clark, Thomas signed the assignment and returned it to Lyn. On August 14, the trial to close the Lewis estate began, and the overpayment claim against Clark, Thomas was severed into its own suit.

On August 17, 1994, Lyn recorded the assignment from Clark, Thomas. Later that same day, the parties met to negotiate a settlement of the litigation. At the meeting, Lyn indicated he did not wish to discuss the Clark, Thomas negotiations, and Harriet stated she did not know anything about the assignment. The discussions resulted in a settlement of the litigation concerning the Lewis estate. On October 17, at Harriet's request, the overpayment claim against Clark, Thomas was dismissed without prejudice. A final judgment was signed on October 18. Attached to it was a mutual release in which each party released the other from liability; however, the release contained a clause which provided that neither party was released from liability concerning the overpayment.

In early October 1994, Jenny learned that Lyn had gotten permission from the Railroad Commission to replace L & G as operator of the lease. On October 31, Jenny, individually and on behalf of L & G Oil Company and as "co-trustee of the testamentary trust pursuant to Lewis's will" and several working interest owners, brought suit against the Lesikars for the overpayment and for an injunction, alleging that the Lesikars had taken and converted to their own use income from estate property. On November 18, Jenny brought suit in the same capacity against the Lesikars for breach of fiduciary duty and fraud. The court granted a temporary restraining order that allowed Jenny to re-enter the lease and operate it as L & G. The suits were joined, and together they form the suit from which the Lesikars bring this appeal.

The trial court submitted special questions to the jury on all theories of recovery and defense. We omit the instructions and definitions. The jury answered as follows:

QUESTION NO. 1

Did Harriet Lewis Lesikar breach her fiduciary duty to Jenny Lou Lewis Rappeport in any of the following respects:

. . . .

Answer "Yes" or "No" to each of the following:

| | | YES | NO |
|---|---|---|---|
| a.) | Failing to disclose to Jenny Lou Lewis Rappeport and Fay Jeter Lewis on or before August 17, 1994 that her husband had acquired the Clark, Thomas interest in the T.W. Lee Lease? | Yes | |
| b.) | Failing to disclose to Jenny Lou Lewis Rappeport and Fay Jeter Lewis on or before August 17, 1994 that the assignment of the Clark, Thomas law firm was recorded in the deed records of Gregg County, Texas at approximately 8:30 a.m. on the morning of August 17, 1994? | Yes | |
| c.) | In settling the Clark[,] Thomas overpayment litigation by allowing the Clark[,] Thomas interest to be assigned to her husband and then dismissing the overpayment litigation after her husband acquired the Clark[,] Thomas interest in the T.W. Lee Lease? | Yes | |
| d.) | By her husband acquiring the Clark[,] Thomas interest hich had been offered to the Estate of H.G. Lewis Jr.? | Yes | |
| e.) | In spending funds deposited with her agent in trust for payment of professional accounting costs of the estate? | Yes | |
| f.) | Transferring the operating interest in the T.W. Lee Lease to her husband without payment of any consideration? | Yes | |
| g.) | Transferring the operating interest in the T.W. Lee Lease to her husband without previously disclosing to all beneficiaries her intention to do so? | Yes | |
| h.) | Secreting the transfer of the operating interest in the T. W. Lee.lease to her husband until such time as the beneficiaries could not challenge such transfer with the Texas Railroad Commission? | Yes | |

QUESTION [NO.] 2

Did Lynwood Lesikar commit fraud against Jenny Lou Lewis Rappeport?

. . . .

Answer "Yes" or "No"

ANSWER: Yes

QUESTION [NO.] 3

Did Harriet Lesikar commit fraud against Jenny Lou Lewis Rappeport?

. . . .

Answer "Yes" or "No"

ANSWER: Yes

QUESTION [NO.] 4

Do you find that any of the following parties were part of a conspiracy that damaged Jenny Lou Lewis Rappeport?

. . . .

| | Did Conspire | Did not Conspire |
|---|---|---|
| A. Harriet Lewis Lesikar | | x |
| B. Lynwood Lesikar | x | |
| C. Others | x | |

QUESTION NO. 5

Did Lynwood Lesikar acquire the Operations of the T.W. Lee Lease by deception?

. . . .

Answer "Yes" or "No."

ANSWER: Yes

[QUESTION NO.] 6

Do you find that the Clark, Thomas law firm did not own an interest in Wells 3A and 7A on the T.W. Lee Lease?

. . . .

Answer "Did Not Own" or "Did Own"

ANSWER: Did Not Own

QUESTION NO. 7

Do you find that Jenny Rapppeport [sic] is estopped from asserting the overpayment claim against Clark[,] Thomas, if any, out of Wells 3A and Wells 7A in the T.W. Lee Lease?

. . . .

Answer "Yes" or "No"

ANSWER: No

QUESTION NO. 8

Do you find that the Clark, Thomas law firm and it's [sic] successor in interest, if any, was overpaid on the production of the T.W. Lee Lease?

Answer "Yes" or "No"

ANSWER: Yes

If you have answered Question No. 8 "Yes" then answer Question No. 9, otherwise do not answer Question No. 9.

QUESTION NO. 9

Do you find that the overpayment was the result of a mutual mistake?

. . . .

Answer "Yes" or "No"

ANSWER: Yes

If you have answered Question No. 8 "Yes" then answer Question No. 10, otherwise do not answer Question No. 10.

QUESTION NO. 10

What amount, if any, do you find the Clark[,] Thomas law firm or its successor Lynwood Lesikar was overpaid on the production of the T.W. Lee Lease

a.) October 1989 to the present? $298,547
b.) For the calendar years 1980
 through September 1989? $239,152

If you have answered Question No. 8 "Yes" then answer Question No. 11, otherwise do not answer Question No. 11.

QUESTION NO. 11

When did a representative of the Estate of H.G. Lewis Jr. know or should they have known of the existence of a potential overpayment claim?

Answer by Month and Year

ANSWER: June 1985

QUESTION [NO.] 12

Did Lynwood Lesikar intentionally interfere with the existing operating agreement between Jenny Lou Lewis Rappeport d/b/a L & G Oil Company and the working interest owners of the T.W. Lee Lease that was not justified?

. . . .

Answer "Did Interfere" or "Did Not Interfere"

ANSWER: Did Interfere

If you have answered Question No. 1, 2, 3, 4, or 5 "Yes" then answer Question No. 13, otherwise do not answer Question No. 13.

QUESTION NO. 13

Do you find that a Constructive Trust should be imposed on the Clark[,] Thomas interest in the T.W. Lee Lease transferred to Lynwood Lesikar?

. . . .

Answer Yes or No:

ANSWER: Yes

QUESTION [NO.] 14

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jenny Lou Lewis Rappeport for her damages, if any, that resulted from such wrongful act you have found in Questions 1, 2, 3, 4, 5 or 12?

Consider the following elements of damages, if any, and none other.

Answer separately in dollars and cents, if any, for each of the following:

1. Costs incurred in correcting the wrongful conduct?

ANSWER: $12,000.00

2. Loss to business reputation?

ANSWER: $0

3. Loss of the value of the Clark[,] Thomas interest on August 9, 1994?

ANSWER: $88,000.00

4. Failure to pay reasonable operational expenses on the T.W. Lee Lease?

ANSWER: $26,122.00

5. Unpaid estate income tax return preparation expense for tax year 1994?

ANSWER: $1,750.00

. . . .

QUESTION [NO.] 15

What is a reasonable fee for the necessary services of Jenny Lou Lewis Rappeport's attorney in this case, stated in dollars and cents?

Answer in Dollars and Cents with an amount for each of the following:

a. For preparation and trial.

ANSWER: $253,444

b. For an appeal to the Court of Appeals.

ANSWER: $30,000

c. For making or responding to a petition for review to the Supreme Court of Texas.

ANSWER: $15,000

If you have found by clear and convincing evidence your answers to Question Nos. 1, 2, 4, 5 or 12 then answer Question No. 16, otherwise do not answer Question No. 16.

QUESTION [NO.] 16

What sum of money, if any, should be assessed against Lynwood Lesikar and awarded to Jenny Lou Lewis Rappeport as exemplary damages for the conduct found in response to Question[s] 1, 2, 4, 5, or 12?

. . . .

Answer in dollars and cents, if any.

ANSWER: $2 million

If you have found by clear and convincing evidence your answers [to] Question Nos. 1, 3, or 4 then answer Question No. 17, otherwise do not answer Question No. 17.

QUESTION [NO.] 17

What sum of money, if any, should be assessed against Harriet Lesikar and awarded to Jenny Lou Lewis Rappeport as exemplary damages for the conduct found in response to Question 1, 3, or 4?

. . . .

Answer in dollars and cents, if any.

ANSWER: $500,000.00

QUESTION NO. 18

Do you find that Jenny Lou Rappeport and L & G Oil Company ratified the assignment by Clark, Thomas, Winters & Shapiro to Lynwood Lesikar by sending invoices for expenses, and receiving payments on some of the invoices?

. . . .

Answer "Yes" or "No"

ANSWER: No

QUESTION NO. 19

Do you find that Jenny Lou Rappeport and L & G Oil Company have waived the ability to contest the assignment to Lynwood Lesikar by Clark, Thomas, Winters & Shapiro by sending invoices for expenses, and receiving payments on some of the invoices?

. . . .

Answer "Yes" or "No"

ANSWER: No

QUESTION NO. 20

Do you find that Jenny Lou Rappeport and/or L & G Oil Company committed waste in selling the oil from the T.W. Lee Lease for a price lower than that available, to the detriment of all working interest owners?

. . . .

Answer "Yes" or "No"

ANSWER: No

If you have answered Question No. 20 "Yes" then answer Question No. 21, otherwise do not answer Question No. 21.

QUESTION NO. 21

What sum of money, if any, do you find to be the damages sustained by Lynwood Lesikar as a proximate cause of the conduct of Jenny Lou Rappeport?

Answer in Dollars and Cents, if any.

ANSWER: $0

QUESTION NO. 22

Do you find that Jenny Lou Rappeport committed malicious prosecution of Lynwood Lesikar that proximately caused Lynwood Lesikar to suffer damages?

. . . .

Answer "Yes" or "No"

ANSWER: No

If you have answered Question No. 22 "Yes" then answer Question No. 23, otherwise do not answer Question No. 23.

QUESTION NO. 23

What sum of money, if any, do you find would fairly and reasonably compensate Lynwood Lesikar for his damages and losses that were proximately caused by Jenny Lou Rappeport on the occasion in question, if any?

. . . .

Answer in Dollars and Cents

ANSWER: $0

QUESTION NO. 24

What is a reasonable fee for the necessary services of Lynwood Lesikar's attorney in this case in reference to the title dispute?

Answer in Dollars and Cents with an amount for each of the following:

| | | |
|---|---|---|
| Preparation and trial | ANSWER: | $35,000.00 |
| For representation on appeal, if any, to the Court of Appeals | ANSWER: | $30,000.00 |
| For representation on appeal, if any, to the Supreme Court of Texas | ANSWER: | $15,000.00 |

The court rendered judgment based on the jury's answers.

The Lesikars challenge the jury answers in Jenny's favor regarding breach of fiduciary duty, fraud, ratification, waiver, and conspiracy on the basis that they are not supported by legally and/or factually sufficient evidence. They also challenge the actual damages awards, including the constructive trust and overpayment awards, as well as the punitive damages awards.

BREACH OF FIDUCIARY DUTY AND FRAUD

The jury found that Harriet breached her fiduciary duty to Jenny in many respects and that both Harriet and Lyn were guilty of fraud. The Lesikars contend that the assignment from Clark, Thomas to Lyn did not amount to a breach of fiduciary duty or fraud by Harriet, and they contend that the trial court erred in failing to disregard jury findings 1a, 1b, 1c, 1d, 2, and 3 because there is no evidence or factually insufficient evidence to support them. They also contend that Harriet's dismissing the suit against Clark, Thomas for the overpayment did not amount to a breach of fiduciary duty or fraud, and they contend that the trial court erred in failing to disregard the jury's answers to questions 1c, 2, and 3. They also contend that the transfer of the operations of the T.W. Lee oil lease to Lyn did not amount to breach of fiduciary duty or fraud, and they contend that the trial court erred in failing to disregard the jury's answers to questions 1f, 1g, 1h, 2, and 3.

The Lesikars attack all of the jury's findings related to breach of fiduciary

duty. In their first point, they attack the legal and factual sufficiency of findings 1a through 1d. In their third point, they attack the legal sufficiency of findings 1f through 1h. In a later point regarding actual damages, they attack the legal sufficiency of finding 1e. If any one of the findings of breach may be upheld, the jury's finding that Harriet breached her fiduciary duty may be upheld. We will first address finding 1c, which speaks to the heart of this case, the assignment and dismissal, or the settling of the estate's overpayment claim.

■ A challenge on appeal that the trial court failed to disregard a jury finding must be construed as a legal sufficiency challenge. *See Brown v. Bank of Galveston, Nat'l Ass'n,* 930 S.W.2d 140, 145 (Tex. App.-Houston [14th Dist.] 1996), *aff'd,* 963 S.W.2d 511 (Tex.1998). In reviewing a legal sufficiency or "no evidence" question, we consider all the evidence in the light most favorable to the jury finding, indulging every reasonable inference in favor of the finding. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). If there is more than a scintilla of competent evidence to support the jury finding, we will affirm the finding. The evidence supporting the finding amounts to more than a scintilla if it supplies a reasonable basis for reasonable minds to reach differing conclusions as to the existence of the crucial fact. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d at 25; *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

When reviewing the factual sufficiency of the evidence to support the jury's verdict, we examine all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.-Houston [1st Dist.] 1993, writ denied). After considering and weighing all of the evidence, we will set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). When undertaking a factual sufficiency review, we may not merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Merckling v. Curtis,* 911 S.W.2d 759 (Tex. App.-Houston [1st Dist.] 1995, writ denied); *Hollander v. Capon,* 853 S.W.2d at 726. The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we may not act as a thirteenth juror in assessing the evidence and the credibility of the witnesses. *Seelbach v. Clubb,* 7 S.W.3d 749, 755 (Tex.App.-Texarkana 1999, pet. denied).

It is undisputed that Harriet and Jenny were both co-executrices and beneficiaries of the Lewis estate. As both co-executrices and beneficiaries, each owed the other a fiduciary duty, and each was entitled to the other's fulfilling her fiduciary obligations.

■ An executrix of an estate is a fiduciary of the estate beneficiaries. As a fiduciary, she owes the beneficiaries a strict duty of good faith and candor, as well as the general duty of full disclosure respecting matters affecting the beneficiaries' interests. *Montgomery v. Kennedy,* 669 S.W.2d 309, 313 (Tex.1984); *Welder v. Green,* 985 S.W.2d 170, 175 (Tex.App.-Corpus Christi 1998, pet. denied); *Hawthorne v. Guenther,* 917 S.W.2d 924, 934 (Tex. App.-Beaumont 1996, writ denied); *Chien v. Chen,* 759 S.W.2d 484, 495 (Tex.App.-Austin 1988, no writ). The existence of strained relations between the parties does not lessen the fiduciary's duty of full and complete disclosure. *Montgomery v. Kennedy,* 669 S.W.2d at 313. The executrix of an estate is held to the same high fiduciary duties and standards in the administration of a decedent's estate that are applicable to trustees. *Humane Soc'y of Austin & Travis County v. Austin Nat'l Bank,* 531 S.W.2d 574, 577 (Tex.1975); *Evans v. First Nat'l Bank of Bellville,* 946 S.W.2d 367,

379 (Tex.App.-Houston [14th Dist.] 1997, writ denied); *Ertel v. O'Brien,* 852 S.W.2d 17, 20 (Tex.App.-Waco 1993, writ denied). In discussing the fiduciary duties of trustees, the Texas Supreme Court has stated that the trustee's duty of loyalty prohibits him from using the advantage of his position to gain any benefit for himself at the expense of his trust and from placing himself in any position where his self-interest will or may conflict with his obligations as trustee. *Slay v. Burnett Trust,* 143 Tex. 621, 187 S.W.2d 377, 388 (1945).

It is a well-settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to in any wise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity.

*Slay v. Burnett Trust,* 187 S.W.2d at 388; *accord Humane Soc'y of Austin & Travis County v. Austin Nat'l Bank,* 531 S.W.2d at 577.

 Generally, there is a presumption that property acquired during marriage is community property. *Wilson v. Wilson,* 145 Tex. 607, 201 S.W.2d 226, 227 (1947). Because Lyn acquired Clark, Thomas's interest in wells 2 and 5 as community property in exchange for the claim of overpayment, Harriet also acquired the interest in wells 2 and 5 in exchange for the claim of overpayment. The Lesikars argue that the interest Clark, Thomas assigned to Lyn was not *estate* property, and therefore Harriet, by obtaining it through the assignment to Lyn, did not breach her fiduciary duty by acquiring estate property in violation of the statute. We agree that Clark, Thomas's interest in wells 2 and 5 was not property belonging to the estate. The estate, however, owned the claim of overpayment on wells 3A and 7A, a valuable right. Harriet did more than simply acquire the Clark, Thomas interest;

through Lyn, she acquired it in exchange for indemnifying Clark, Thomas against this claim of overpayment.

The Lesikars argue that Harriet did not breach her duty by doing so because Jenny, rather than looking to Clark, Thomas, could look to Lyn and Harriet, who merely "indemnified" Clark, Thomas, for reimbursement of the overpayment. If the overpayment claim was valid, Harriet indeed had a duty not to obtain for Lyn and herself the interest in wells 2 and 5 in exchange for indemnifying the overpayment claim. By doing so, she created a conflict of interest between herself and the estate, which alone the law considers a breach of fiduciary duty. As co-executrix of the estate, she was an estate-creditor; she was required to pursue the claim for overpayment on behalf of the estate. As Lyn's wife, she stepped into Clark, Thomas's shoes and became an estate-debtor; if the overpayment claim was valid, she was required to pay the estate for the overpayment. As an estate-debtor, Harriet had no incentive to aggressively pursue the claim for overpayment against herself which, as an estate-creditor, she was required to do. In fact, Lyn agreed to do more than indemnify Clark, Thomas; he agreed that he and Harriet would not pursue the overpayment claim, and Harriet ultimately dismissed the overpayment litigation.

In addition, notwithstanding that Lyn bargained for Clark, Thomas's interest by promising to abandon the overpayment claim, the Lesikars contend that "there is no evidence that an actual overpayment existed" and that Harriet dismissed the overpayment litigation in good faith. However, Clark, Thomas admitted and no one disputed that Clark, Thomas did not own an interest in wells 3A and 7A and yet received payment for those wells. The Lesikars' true dispute regarding the validity of the overpayment is that the evidence was factually insufficient to prove the *amount* of the overpayment. In addition, all the parties acted as if the claim had

value; otherwise, they would not have exchanged it or used it as a bargaining tool to acquire the interest in wells 2 and 5. Harriet, therefore, had a duty to pursue the claim on behalf of the estate and not to dismiss the litigation. Her good faith is irrelevant to her breach of duty. By acquiring the interest in wells 2 and 5 and then dismissing the overpayment litigation, Harriet not only created a conflict of interest between herself and the estate, but also she acquired property for her personal benefit while acting as a fiduciary.

All transactions between a fiduciary and his principal are presumptively fraudulent and void; therefore, the burden lies on the fiduciary to establish the validity of any particular transaction in which he is involved. *Chien v. Chen,* 759 S.W.2d at 495. Where a fiduciary relationship exists, the burden is on the fiduciary to show that he acted fairly and informed the other party of all material facts relating to the challenged transaction. *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). The Lesikars' attempts to overcome this presumption fail.

As evidence of the fairness of the actions in question, the Lesikars contend that Harriet's actions do not amount to breach of fiduciary duty or fraud because Harriet's primary duty was to "wind up" the estate. In April of 1994, the trial court gave directives that the lingering estate be closed. According to the Lesikars, winding up required only that Harriet pay estate debts and distribute property. While it is true that the purpose of administering an estate is to satisfy the claims of the decedent's creditors and to distribute the remainder of the estate among the decedent's heirs, included within the executor's many duties is the duty to collect all claims and debts due the estate and to recover possession of all property of the estate to which its owners have claim or title. *See* TEX. PROB.CODE ANN. § 233(a) (Vernon Supp.2000). Administration therefore protects both the rights of the decedent's heirs and the interests of the decedent's creditors. *Patterson v. Allen,* 50 Tex. 23 (1878); *So. Underwriters v. Lewis,* 150 S.W.2d 162 (Tex.Civ.App.-Texarkana 1941, no writ). The whole scheme of probate law favors speedy administration, commensurate with the reasonable protection of all interests involved. *Ryan's v. Flint,* 30 Tex. 382 (1867). We fail to see how a directive to close the estate entitled Harriet and Lyn to acquire the Clark, Thomas interest for themselves in settlement of the estate's claim for overpayment.

The Lesikars further contend that when Harriet dismissed the claim against Clark, Thomas on October 17, 1994, the claim had already been distributed to estate beneficiaries who could make their own choices about prosecuting it. Their argument is that the estate had been closed in *August* of 1994 and therefore the claim was not a claim of the estate. The final settlement of the estate, however, was not filed until *October* 18, 1994, one day after Harriet dismissed the claim. In addition, in that settlement agreement, the parties executed a mutual release in which each party released the other from liability. But that document stated that each party was released from liability "with the exception of claims or obligations related to . . . operation of the T.W. Lee Oil Lease subsequent to August 17, 1994, and the interest of the Clark, Thomas, Winters & Shapiro Law Firm in the T.W. Lee Oil Lease and debts and overpayments relating thereto." So, that claim remained a claim of the estate. Regardless, it is a duty of a co-executor, not the beneficiaries, to prosecute claims owed to the estate. TEX. PROB.CODE ANN. § 233(a).

The Lesikars further contend that the trial court erred in failing to disregard findings 2 and 3, in which the jury found that Harriet and Lyn committed fraud. They insist that the assignment and dismissal did not amount to fraud. The court instructed the jury that fraud occurs when:

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

The fraud findings were broad and were not based on any particular act. A challenge on appeal that the trial court failed to disregard a jury's finding must be construed as a legal sufficiency challenge. *See Brown v. Bank of Galveston, Nat'l Ass'n*, 930 S.W.2d at 145. Thus, looking only at the evidence that favors the jury's findings and ignoring all evidence to the contrary, the question before us is whether there is more than a scintilla of competent evidence to support the jury finding that Harriet and Lyn committed fraud.

■■■ Fraud requires a material misrepresentation that was false; was either known to be false when made or was asserted without knowledge of its truth; was intended to be acted on; was relied on; and that caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). Silence is equivalent to a false representation where circumstances impose a duty to speak and one deliberately remains silent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986). So, for there to be actionable nondisclosure fraud, there must be a duty to disclose. *Bradford v. Vento*, 997 S.W.2d 713, 725 (Tex.App.-Corpus Christi 1999, pet. granted); *Hoggett v. Brown*, 971 S.W.2d at 487–88. Whether such a duty exists is a question of law. *Bradford v. Vento*, 997 S.W.2d at 725. A duty to disclose may arise in four situations: (1) where there is a special or fiduciary relationship; (2) where one voluntari-

ly discloses partial information, but fails to disclose the whole truth; (3) where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; and (4) where one makes a partial disclosure and conveys a false impression. *Id.; Hoggett v. Brown*, 971 S.W.2d at 487 (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 941 S.W.2d at 146–47).

Although Harriet notified Jenny and collaborated with her to some extent with regard to the initial settlement negotiations between the estate and Clark, Thomas about exchanging the interest in wells 2 and 5 for the overpayment claim, when those negotiations broke down Harriet did not notify Jenny that Lyn was acquiring the Clark, Thomas interest for himself until well after the fact.

■■■ Considering only the evidence that favors the jury's findings and ignoring all evidence to the contrary, we find some evidence to support the jury's findings that Lyn and Harriet committed fraud on Jenny and the estate by failing to disclose their dealings in exchanging the overpayment for Clark, Thomas's interest in wells 2 and 5.

The Lesikars contend that the trial court erred in failing to disregard jury findings 1f, 1g, 1h, and 5, by which the jury found that Harriet breached her fiduciary duty to Jenny by,

1f transferring the operating interest in the T.W. Lee Lease to her husband without payment of any consideration;

1g transferring the operating interest in the T.W. Lee Lease to her husband without previously disclosing to all beneficiaries her intention to do so;

1h secreting the transfer of the operating interest in the T.W. Lee Lease to her husband until such time as the beneficiaries could not challenge such transfer with the Texas Railroad Commission.

In question 5, the jury found that Lyn acquired the operations of the lease by deception.

We have already determined there is legally sufficient evidence to support the findings of breach of fiduciary duty in findings 1a, 1b, 1c, 1d, and 1e; therefore, we will not address whether the evidence is legally sufficient to support findings 1f, 1g, and 1h. We also find sufficient evidence to support the jury's answer to question 5.

### RATIFICATION AND WAIVER

After learning of Clark, Thomas's assignment of its interest in wells 2 and 5 to Lyn, Jenny began to bill Lyn for operating expenses associated with those wells. In questions 18 and 19, the jury failed to find that by this conduct Jenny ratified the assignment or waived her right to complain of the assignment. On appeal, the Lesikars challenge the legal and factual sufficiency to support the jury's failure to find ratification or waiver.

Ratification and waiver are affirmative defenses that the defendant must prove. The party with the burden of proof who challenges the legal sufficiency to support the jury's failure to find must surmount two hurdles. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Seelbach v. Clubb*, 7 S.W.3d at 755; *Neese v. Dietz*, 845 S.W.2d 311, 313 (Tex.App.-Houston [1st Dist.] 1992, writ denied). The party must show that no evidence supports the failure to find and that the evidence establishes the desired finding as a matter of law. *Ramsey v. Lucky Stores, Inc.*, 853 S.W.2d 623 (Tex.App.-Houston [1st Dist.] 1993, writ denied). First, we review the evidence in the light most favorable to the jury finding, indulging every reasonable inference in favor of the finding. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d at 285–86. If there is more than a scintilla of competent evidence to support the jury finding, we will affirm the finding. *Orozco v. Sander*, 824 S.W.2d at 556. Evidence amounts to more than a scintilla if it supplies a reasonable basis for reasonable minds to reach differing conclusions as to the existence of the crucial fact. *Id.* If there is no evidence to support the finding, then an examination of the entire record must demonstrate that the contrary proposition is established as a matter of law. *Seelbach v. Clubb*, 7 S.W.3d at 755. If the proposition asserted by the appellant is established as a matter of law, the point of error will be sustained. *Id.*

Great weight points are factual sufficiency challenges. Only one standard of review is used in reviewing factual sufficiency challenges, regardless of whether the court of appeals is reviewing a negative or affirmative jury finding or whether the complaining party had the burden of proof on the issue. *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.-Houston [1st Dist.] 1987, no writ). Therefore, we apply the appropriate standard of review, which we have set out above.

Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a prior act that did not then legally bind that person and which that person had the right to repudiate. *Facciolla v. Linbeck Constr. Corp.*, 968 S.W.2d 435, 440 (Tex.App.-Texarkana 1998, no pet.). Ratification may be either express or implied, but it must result from acts clearly evidencing an intention to ratify. *Id.* Waiver is the intentional relinquishment of a known right, or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex.1987). Thus, like ratification, waiver is largely a question of intent. *Kennedy v. Bender*, 104 Tex. 149, 135 S.W. 524, 525 (1911). There can be no waiver unless so intended by one party and so understood by the other. *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex. App.-Texarkana 1992, writ denied).

Although in their brief to this Court the Lesikars argue that a great many of Jenny's actions evidence ratification and waiv-

er, the questions to the jury based ratification and waiver only on Jenny's having sent invoices to Lyn and having accepted payments from him. The Lesikars do not argue that they submitted a different question to the jury, that the court refused their request, or that the question submitted was too specific or otherwise improper. Thus, the narrow issue before us is whether Jenny's sending invoices to Lyn and accepting payments from him established either ratification or waiver as a matter of law, and whether the jury's failure to find ratification or waiver on the basis of that conduct is against the great weight of the evidence.

Ratification was not established as a matter of law merely from Jenny's billing Lyn for lease expenses and receiving payments from him. Jenny's actions in this regard could have reflected only that she knew Lyn had received a purported assignment of Clark, Thomas's interest in wells 2 and 5. Certainly, the assignment was notice to her that Lyn *claimed* to own the interest, but even if Jenny's acts were a recognition that Lyn had acquired title to the interest, her dealing with him on that basis did not, as a matter of law, ratify Lyn's fraudulent acts in acquiring that interest. If Lyn had acquired the interest directly from Jenny, her acts in dealing with him as the owner would have constituted a ratification of his title. But since he acquired the title from a third party, Jenny could treat him as the owner, but still seek to recover damages from him because of his fraud in acquiring the interest, or seek to impose a constructive trust on the interest. *See Ford v. Culbertson,* 158 Tex. 124, 308 S.W.2d 855, 865 (1958); *Vessels v. Anschutz,* 823 S.W.2d at 764–65. We also find that the jury's failure to find ratification is not against the great weight of the evidence.

Similarly, the fact that Jenny billed Lyn for expenses and otherwise dealt with him as if he were the owner of the Clark, Thomas interest falls short of establishing as a matter of law that she intended there-

by to waive Harriet's breach of fiduciary duty and Lyn's and Harriet's fraud. Her lack of intent to waive is indicated by the fact that she brought suit against the Lesikars well before she began to bill Lyn for expenses. Waiver was not established as a matter of law, and we do not find that the jury's failure to find waiver is against the great weight of the evidence.

## CONSPIRACY

██ In question 4, the jury found that Harriet, Lyn, and "others" were part of a conspiracy that damaged Jenny. The Lesikars complain of the legal and factual sufficiency of the evidence to support the jury's finding that Harriet, Lyn, and "others" engaged in a conspiracy. They first contend that there can be no liability for conspiracy because there was no valid underlying tort. They also contend that the evidence negates the finding of a conspiracy because the evidence established the contrary as a matter of law, or the great weight of the evidence demonstrated that neither Lyn nor Harriet knowingly conspired to commit any wrong. We overrule these contentions.

The Lesikars challenge both the legal sufficiency and the factual sufficiency of the evidence to support the jury's finding. We apply the appropriate standards of review, which we have already set out above.

██ A civil conspiracy is a combination by two or more persons or entities to accomplish an unlawful purpose, or a lawful purpose by unlawful means. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983); *Facciolla v. Linbeck Constr. Corp.,* 968 S.W.2d at 444–45. The elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.,* 652 S.W.2d at 934; *Facciolla v. Linbeck Constr. Corp.,* 968 S.W.2d at 445. It is not the agreement itself, but an injury to the plaintiff result-

ing from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy. *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925 (Tex.1979). In other words, recovery is not based on the conspiracy; instead, it is based on an underlying tort. *Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex.1996); *Fisher v. Yates,* 953 S.W.2d 370, 381 (Tex. App.-Texarkana 1997), *pet. denied per curiam,* 988 S.W.2d 730 (Tex.1998). Types of torts or unlawful acts on which a cause of action for conspiracy may be based include breach of a fiduciary duty and fraud, as in this case. *See, e.g., Phippen v. Deere & Co.,* 965 S.W.2d 713, 722 (Tex.App.-Texarkana 1998, no pet.); *Fisher v. Yates,* 953 S.W.2d at 381; *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 411–13 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.).

We have held that the evidence in this case is legally sufficient to support the jury's findings of breach of fiduciary duty and fraud; therefore, we hold that valid underlying torts were established capable of providing the basis for the conspiracy finding.

The Lesikars also contend that neither Harriet nor Lyn knowingly conspired to commit any wrong. Specifically, they contend that Harriet did not know of the assignment of the Clark, Thomas interest when she dismissed Clark, Thomas from the lawsuit. They contend that Lyn acted independently as well, without knowledge of Harriet's dismissing Clark, Thomas from the lawsuit.

██ One of the essential elements required to establish a civil conspiracy is a meeting of the minds on the object or course of action. *Massey v. Armco Steel Co.,* 652 S.W.2d at 934. Therefore, for conspiracy, the participants must at least have knowledge of the object and purpose of a conspiracy. One without knowledge of the object and purpose of a conspiracy cannot be a co-conspirator; he cannot agree, either expressly or tacitly, to the commission of a wrong of which he is not aware. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 857 (Tex.1968); *Pairett v. Gutierrez,* 969 S.W.2d 512, 516 (Tex.App.-Austin 1998, pet. denied).

██ Conspiracy may be established by circumstantial evidence. *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567 (Tex.1963); *Fisher v. Yates,* 953 S.W.2d at 379. The Texas Supreme Court has stated, "A conspiracy may be proven as well by the acts of the conspirators, as by anything they may say, touching what they intended to do." *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 581 (quoting *Whitmore v. Allen,* 33 Tex. 355 (1870)). The Supreme Court has further stated:

> The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.
>
> .... It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction. Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions....

*Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 581–82 (citations omitted); *accord Fisher v. Yates,* 953 S.W.2d at 379.

We conclude that the evidence is sufficient to support an inference that Lyn and Harriet participated jointly, and knowingly conspired to commit wrongs. As we have noted, while Harriet testified that she did not know about the assignment from Clark, Thomas to Lyn until well after it was executed, she admitted that she had knowledge that Lyn was interested in acquiring the Clark, Thomas interest. Without stating that she actually read any

correspondence about the assignment, Harriet also testified that copies of any correspondence from Werley regarding the estate would have been sent to her. In fact, the record reflects that Werley copied "Mr. and Mrs. Lesikar" on both the proposed assignment dated July 14, 1994, which he sent to Bishop, and the "Rule 11 agreement" that he accepted and returned to Bishop on August 8, 1994. In addition, Harriet testified that Werley had advised her on several occasions to dismiss the overpayment litigation, but it was not until a few days after Lyn acquired the interest that Harriet decided to do so. This is sufficient evidence that Harriet knew of the scheme to acquire the Clark, Thomas interest in wells 2 and 5 in exchange for the estate's overpayment claim.

Although Lyn claims he acted independently of Harriet without knowledge of the dismissal, in other matters relating to the estate he acted on Harriet's behalf and with Harriet's knowledge. For example, at Harriet's direction he reviewed the deed records and discovered the overpayment claim. He also calculated the amount of the overpayment, on which Harriet relied in filing suit against Clark, Thomas for the overpayment. In addition, Lyn promised, in agreeing to the "Rule 11 agreement," that in exchange for Clark, Thomas's interest in wells 2 and 5, not that he would simply indemnify Clark, Thomas, but that he and Harriet would not pursue the overpayment claim against Clark, Thomas. A promise that *Lyn* would not seek to collect the overpayment was worthless, because the overpayment claim did not belong to him, but belonged to the estate. Harriet, as a co-executrix of the estate, was needed to fulfill Lyn's purported independent promise, which she did by dropping Clark, Thomas from the lawsuit just days after the assignment to Lyn was recorded. This is sufficient evidence for the jury to find that Lyn knew of the scheme to acquire the Clark, Thomas interest in wells 2 and 5 in exchange for the estate's overpayment claim.

We conclude that there is sufficient evidence that Lyn and Harriet knowingly conspired to breach Harriet's fiduciary duty to Jenny and other estate beneficiaries, and to fraudulently acquire the Clark, Thomas interest in wells 2 and 5 in exchange for the estate's overpayment claim.

## CONSTRUCTIVE TRUST

■■ The Lesikars challenge the jury findings and the trial court's judgment imposing a constructive trust on the working interest in wells 2 and 5 acquired by Lyn from Clark, Thomas. We find there is sufficient evidence to justify the imposition of a constructive trust.

■■■■ A constructive trust is a device equity uses to remedy a wrong. *See Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex.1974); *Cawthon v. Cochell*, 121 S.W.2d 414 (Tex.Civ.App.-Amarillo 1938, writ dism'd). When property has been acquired under circumstances where the holder of legal title should not in good conscience retain the beneficial interest, equity will convert the holder into a trustee. *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158 (1943). A classic case for the imposition of a constructive trust is where one party fraudulently uses something of value belonging to another to acquire title to property for himself. *See Lotus Oil Co. v. Spires*, 240 S.W.2d 357, 359 (Tex.Civ.App.-El Paso 1950, writ ref'd n.r.e.); *Collins v. Griffith*, 105 S.W.2d 895 (Tex.Civ.App.-Amarillo 1937, no writ). A constructive trust may be imposed where one acquires legal title to property in violation of a fiduciary relationship. *See Binford v. Snyder*, 144 Tex. 134, 189 S.W.2d 471 (1945); *Dilbeck v. Blackwell*, 126 S.W.2d 760 (Tex.Civ.App.-Texarkana 1939, writ ref'd).

There is ample evidence to justify imposing a constructive trust on the interest acquired by the Lesikars. Although the title to the working interest was assigned to Lyn, the legal title was acquired by Lyn as community property of himself and Harriet. Thus, Harriet also became a

holder of an interest in the property by virtue of the assignment. We have previously held that Harriet breached her fiduciary duty in dismissing the overpayment claim and acquiring the Clark, Thomas working interest. Lyn was likewise guilty of fraud and deceit in procuring the interest.

■ The final judgment awarded as damages not only a constructive trust over the Clark, Thomas interest in wells 2 and 5, but also part of the overpayment. The Lesikars contend that the overpayment award, in addition to the constructive trust award, is a windfall. We agree.

■ When one's funds or other assets are used by a fiduciary to acquire property for himself, the aggrieved party may seek the property itself or its value. *See D. Sullivan & Co. v. Ramsey*, 155 S.W. 580, 586 (Tex.Civ.App.-San Antonio 1913, no writ); *Ingenhuett v. Hunt*, 15 Tex.Civ.App. 248, 39 S.W. 310 (1897, writ ref'd); 90 C.J.S. *Trusts* § 450, at 865 (1955). Thus, the beneficiary may elect which remedy to pursue. Jenny prayed for recovery of the overpayment, or alternatively for a constructive trust on the Clark, Thomas working interest in wells 2 and 5. The jury awarded Jenny both the overpayment and the working interest, and neither the estate nor Jenny has elected between those recoveries. Under the authority of *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361 (Tex.1987), we hold that Jenny should recover her rightful interest in the property, which the evidence shows to be of a greater value than her share of the claim for overpayment. *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d at 367, holding that where the prevailing party fails to elect between alternative measures of damages, the court should use the findings affording the greater recovery and render judgment accordingly.

The amount the jury awarded as the recoverable overpayment was $298,547.00. James Davis's testimony was that the present market value of the working inter-

est in wells 2 and 5 was $207,842.69. We are aware that the amount of the recovery for the overpayment might suggest that it is more valuable than the recovery of the ⅙ working interest in wells 2 and 5; however, we must remember that the claim for overpayment was not certain. Jenny's or the estate's ability to recover all the alleged overpayment was speculative at best. Moreover, the current market value does not give adequate consideration to future revenues that wells 2 and 5, which are producing wells, will generate. In addition, through all of their conduct, Harriet and Lyn certainly acted as if the working interest in wells 2 and 5 was more valuable than the claim for overpayment.

■ We therefore delete the overpayment award from the judgment and uphold the imposition of a constructive trust, with modification. The final judgment held the entire interest in the Clark, Thomas interest in constructive trust and distributed it in equal thirds to Jenny for life, Harriet for life, and Fay in fee simple. However, Lewis bought the interest in the T.W. Lee lease before he and Fay were married; therefore, it was his separate property, which in his will he gave in equal portions to Harriet and Jenny. If the estate had recovered the overpayment, Harriet and Jenny, as co-equal beneficiaries under Lewis's will, each would have received one half. As such, Lyn holds the Clark, Thomas interest in wells 2 and 5 in constructive trust only as to Jenny's one half. Jenny should receive that one half, while Harriet keeps the other.

As we have stated, the Lesikars argue that they did not release the Clark, Thomas overpayment claim, so the estate lost nothing when they acquired the working interest. They argue that Lyn only indemnified Clark, Thomas against any claims for the overpayment, and Lyn now, in effect, still owes the overpayment to Jenny and the estate. We disagree. Even if Lyn's indemnification to Clark, Thomas on the overpayment only substitutes one debtor for another, that substitu-

tion was not authorized by Jenny or the estate, and it deprives them of a valuable asset—the availability of recovery from Clark, Thomas. Additionally, as we have already noted, substituting Lyn and Harriet as debtors in the place of Clark, Thomas places Harriet in a conflict of interest relationship to the estate.

ACTUAL DAMAGES

The final judgment indicates that the trial court awarded part of the overpayment as actual damages. The Lesikars raise several contentions relating to that recovery. We have held that because of the election of remedies rule, Jenny cannot recover both the property through a constructive trust and the claim for overpayment that was used to acquire the property. We have sustained the recovery of the working interest by a constructive trust and will eliminate the recovery of the overpayment, thus making it unnecessary to discuss the Lesikars' remaining contentions pertaining to that recovery.

In question 14, the jury awarded Jenny additional actual damages for 1) "costs incurred in correcting the wrongful conduct," 2) "failure to pay operational expenses on the T.W. Lee Lease," 3) "loss of the value of the Clark, Thomas interest on August 9, 1994," and 4) "unpaid estate income tax return preparation expense for tax year 1994." The judgment indicates that the trial court, rather than awarding the third element, imposed a constructive trust over the interest in wells 2 and 5. The Lesikars contend that the form of Question 14 was error and that the first, second, and fourth damage awards are unrecoverable for various reasons.

Form of the Question

■■■ Question 14 asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Jenny Lou Lewis Rappeport for her damages, if any, that *resulted from* such wrongful act you have found in Questions 1, 2, 3, 4, 5 or 12?" (emphasis added). In questions 1, 2,

and 3, the jury found Harriet liable for breach of fiduciary duty and Harriet and Lyn liable for fraud. The Lesikars contend that the breach of fiduciary duty and fraud theories on which the damage question was partly predicated limit recovery to damages that are proximately caused by their actions. They contend that the submission of question 14 was error because the court used the words "resulted from" and did not require the jury to find that the damages were proximately caused by the wrongful acts, thereby lessening Jenny's burden of proof. We overrule this contention.

■■■ Actual damages available for breach of fiduciary duty and fraud include both general or direct damages and special or consequential damages. *See Airborne Freight Corp. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 295 (Tex.App.-El Paso 1992, writ denied). Direct damages compensate the plaintiff for loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex.1997). Consequential damages, unlike direct damages, are not presumed to have been foreseen or to be the necessary and usual result of the wrong. Plaintiff must plead and prove them separately, and they must be premised on a finding that they proximately resulted from the wrongful conduct of the defendant. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d at 816; *Airborne Freight Corp. v. C.R. Lee Enters., Inc.,* 847 S.W.2d at 295. Thus, courts speak of a proximate cause or a foreseeability showing in the context of special or consequential actual damages only, not in the context of direct actual damages. Additionally, the Texas Pattern Jury Charges suggest that a damage question asking the jury to assign *direct* damages resulting from fraud should use the words "resulted from," while a question asking the jury to assign *consequential* damages should use the words "proximately caused by." *See* 4 COMM. ON PATTERN

Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 110.19, 110.20 (1990).

In the trial court, the Lesikars objected simply that question 14 contained "no issues of proximate cause." On appeal, they do not contend that question 14 asks the jury to award special or consequential damages. Instead, they argue simply that the breach of fiduciary duty and fraud theories require a finding that the damages were proximately caused by their actions. Assuming the Lesikars' objection preserved error, their argument is incorrect, and we overrule the contention.

### Costs Incurred in Correcting the Wrongful Conduct

■ After the assignment of wells 2 and 5 to Lyn, and on the Lesikars' application made without Jenny's knowledge, the Railroad Commission transferred the operations of the T.W. Lee lease from L & G to Lyn. As a result, Jenny incurred attorneys' fees in contesting the transfer of operations before the Railroad Commission. In question 14(1), the jury awarded Jenny $12,000.00 as "costs of correcting wrongful conduct." The parties have stipulated that the "cost of correcting wrongful conduct" award refers to the Austin attorneys' fees. The Lesikars challenge the award of the Austin attorneys' fees on several grounds. One of their arguments is that Jenny was required, but failed, to present expert testimony that the fees were reasonable and necessary. Without addressing the Lesikars' other arguments, we sustain the point on this ground.

■ As a general rule, unless expressly provided for by statute or contract, attorneys' fees incurred in the defense or prosecution of a lawsuit are not recoverable. *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex.1964). But, attorneys' fees incurred in prior litigation with a third party are recoverable in a subsequent suit as actual damages.[1] *See Turner v. Turner*, 385 S.W.2d at 234; *Standard Fire Ins. Co. v. Stephenson*, 963 S.W.2d 81, 90 (Tex. App.-Beaumont 1997, no pet.); *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 129 (Tex.App.-Texarkana 1994, judgm't vacated w.r.m.); *Nationwide Mut. Ins. Co. v. Holmes*, 842 S.W.2d 335, 340–41 (Tex.App.-San Antonio 1992, writ denied); *Baja Energy, Inc. v. Ball*, 669 S.W.2d 836 (Tex.App.-Eastland 1984, no writ); *Powell v. Narried*, 463 S.W.2d 43 (Tex.Civ.App.-El Paso 1979, writ ref'd n.r.e.). The recovery in such a case is based on equitable grounds because the claimant was required to prosecute or defend litigation as a consequence of the wrongful act of the defendant. As in the traditional recovery of attorneys' fees, the plaintiff may recover as damages only those attorneys' fees that are reasonable and necessary. *See Turner v. Turner*, 385 S.W.2d at 234; *Nationwide Mut. Ins. Co. v. Holmes*, 842 S.W.2d at 340–41; *Powell v. Narried*, 463 S.W.2d at 46. As stated by the court of appeals in *Powell*,

> [W]here the natural and proximate consequence of a wrongful act has been to involve a plaintiff in litigation with others, there may, as a general rule, be a recovery in damages of the *reasonable* expenses incurred in such prior litigation ... but such expenses ... must have been incurred *necessarily and in good faith, and the amount thereof must be reasonable.*

---

1. Several courts of appeals have held that the recovery of attorneys' fees is allowed only when provided for by statute or contract, even where such fees were incurred in other litigation and are sought as actual damages. *See, e.g., Peterson v. Dean Witter Reynolds, Inc.*, 805 S.W.2d 541, 549 (Tex.App.-Dallas 1991, no writ); *Cupples Coiled Pipe, Inc. v. Esco Supply Co.*, 591 S.W.2d 615 (Tex.Civ.App.-El Paso 1979, writ ref'd n.r.e.); *Dalton S.S. Corp. v. W.R. Zanes & Co.*, 354 S.W.2d 621, 624 (Tex.Civ.App.-Fort Worth 1962, no writ). We agree with other courts and hold that a plaintiff may recover attorneys' fees as damages where the defendant's wrongful conduct forces the plaintiff to prosecute or defend litigation in another proceeding.

*Powell v. Narried,* 463 S.W.2d at 46 (emphasis added); *accord Nationwide Mut. Ins. Co. v. Holmes,* 842 S.W.2d at 340–41.

At trial, Jenny's attorney asked Jenny only whether she deemed the Austin attorneys' *services,* not *fees,* reasonable and necessary. Jenny answered that she did. The Lesikars objected that "what [Jenny] deems reasonable and necessary . . . is not relevant." They did not offer any controverting evidence. The Lesikars' first contention is that the trial court erred in overruling their objection to Jenny's testimony, in which they claim she testified that her Austin attorneys' fees were reasonable and necessary. They argue that Jenny is not qualified to testify as to the reasonableness and necessity of attorneys' fees.

We do not decide whether Jenny's opinion that her attorneys' fees were reasonable and necessary, had she given it, is irrelevant to that issue. Jenny's testimony was only that she considered the Austin attorneys' work on her case, not their fees, reasonable and necessary. Whether the admission of this particular testimony was irrelevant generally, we need not decide, because this testimony certainly is irrelevant to our determination of the Lesikars' second contention that without expert testimony, there is insufficient evidence of reasonable and necessary attorneys' fees.

Other than Jenny, no witness testified regarding the Austin attorneys' fees. Thus, there was no testimony, expert or otherwise, regarding whether those fees were reasonable and necessary. The only other evidence related to the Austin attorneys' fees were invoices the Austin attorneys sent to Jenny for payment, which indicated the amount of the fees but did not indicate the number of hours worked or an hourly rate.

Jenny has cited no authority, and we have found none, expressly setting out a standard for determining reasonableness in cases where attorneys' fees are sought as damages. We note that in *Powell,* in denying recovery of attorneys' fees because of several inadequacies in the record, the court suggested that some testimony that the fees are reasonable and necessary is required. *See Powell v. Narried,* 463 S.W.2d at 46. Rather than address the sufficiency of her evidence, Jenny argues that pursuant to Section 38.003 of the Texas Civil Practice and Remedies Code, she is entitled to the presumption that "the usual and customary attorney's fees for a claim of the type described in Section 38.001 are reasonable." Tex. Civ. Prac. & Rem.Code Ann. §§ 38.001, 38.003 (Vernon 1997). However, Jenny's action before the Railroad Commission was not brought under Section 38.001; therefore, Jenny cannot benefit from any presumption that statute allows. Further, the presumption necessitates some showing that the fees were usual and customary. Here, the record contains no testimony that the Austin attorneys' fees were usual and customary.

In addition, Jenny cites *Musgrave v. Brookhaven Lake Prop. Owners Ass'n,* 990 S.W.2d 386 (Tex.App.-Texarkana 1998, pet. denied), for the proposition that the trial court can take judicial notice of records in its court in deciding that attorneys' fees are reasonable and necessary. Attorneys' fees in *Musgrave* were awarded by this Court pursuant to Section 5.006 of the Texas Property Code, which is inapplicable to this case. *See Musgrave v. Brookhaven Lake Prop. Owners Ass'n,* 990 S.W.2d at 400. Moreover, in this case, the jury was the trier of fact, and while a party enjoys a presumption of reasonableness and the availability of judicial notice for claims brought under Chapter 38 of the Texas Civil Practice and Remedies Code, neither does that statute apply, and Jenny has not demonstrated that the trial court did, in fact, take judicial notice of anything. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001.

■ Finally, Jenny contends that her uncontroverted testimony may be taken as true as a matter of law. The general rule is that the testimony of an interested wit-

ness, though not contradicted, does no more than raise a fact issue to be determined by the jury. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990); *Disbrow v. Healey,* 982 S.W.2d 189, 192 (Tex.App.-Houston [1st Dist.] 1998, no pet.). However, there is an exception to the rule:

> There may be cases in which the expert testimony as to the value of an attorney's services is so free from inconsistencies, so thoroughly supported by undisputed facts in evidence, and so clearly in accord with knowledge and experience which the jury must have had and with the information obtained by them on the trial, that the court would be justified in accepting that testimony as conclusive. . . .

*Gulf Paving Co. v. Lofstedt,* 144 Tex. 17, 188 S.W.2d 155, 161 (1945). Thus, this exception applies, in the context of proving reasonable attorneys' fees, only to competent evidence of reasonable attorneys' fees. Only Jenny testified, and she testified only that the Austin attorneys' *services* were reasonable.

 Jenny has cited no authority as to why we should not apply in this case the established rules of law pertaining to the reasonableness of attorneys' fees, and we perceive no reason not to, simply because the attorneys' fees here have been awarded as actual damages. Thus, in cases where attorneys' fees incurred in the present litigation are sought, while an attorney's testimony as to the reasonableness of fees is not conclusive proof of that issue, such testimony is generally required. *Gulf Paving Co. v. Lofstedt,* 188 S.W.2d at 161; *Nguyen Ngoc Giao v. Smith & Lamm, P.C.,* 714 S.W.2d 144, 149 (Tex. App.-Houston [1st Dist.] 1986, no writ). Generally, the issue of reasonableness and necessity of attorneys' fees requires expert testimony; an attorney testifies as to reasonableness, and the testifying attorney must be designated as an expert before he testifies. *See E.F. Hutton & Co. v. Youngblood,* 741 S.W.2d 363, 364 (Tex.1987).

We conclude that the attorneys' bills, in the absence of expert testimony as to the reasonableness and necessity of the fees, is insufficient evidence that the fees were reasonable and necessary. We therefore reform the judgment to delete Jenny's recovery of $12,000.00 for costs incurred in correcting the wrongful conduct.

### Unpaid Operational Expenses

 In question 14(4), Jenny recovered as actual damages $26,122.00 for "unpaid operational expenses," the amount that she alleged the Lesikars owed from 1996 through 1998 for their proportionate share of expenses of operating the lease, which Jenny sought under theories of reimbursement, unjust enrichment, and *quantum meruit.* The Lesikars contend that the trial court erred in refusing to disregard the jury's award for these unpaid operating expenses, which they contend is immaterial because the predicating theories of recovery, breach of fiduciary duty, fraud, and conspiracy do not establish any obligation to pay the expenses, but such obligation sounds in contract. We hold that the point has been waived.

 A motion to disregard a jury finding may properly be granted only if the finding has no support in the evidence or the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154 (Tex. 1994). The Lesikars argue that the question regarding unpaid operating expenses should not have been submitted because it is an improper measure of damages under the theories of recovery submitted. This argument amounts to an objection to the charge, which the Lesikars must have made in the trial court, or it is waived. *See* Tex.R. Civ. P. 274. Because the Lesikars failed to object to question 14 on this ground, they have waived the alleged error. *See id.*

### Unpaid Estate Income Tax Return Preparation Expenses

In question 1(e), the jury found that Harriet breached her fiduciary duty by

improperly spending funds that Jenny deposited in trust with Werley for the purpose of paying Harriet's share of accounting costs for the estate's income tax return preparation in 1994. Based on that finding, in question 14(5), the jury awarded Jenny $1,750.00 for Harriet's "unpaid estate income tax return preparation expense for tax year 1994." This figure represents Harriet's one-half share of the total accounting costs which Jenny, on behalf of the estate, ultimately paid to the accountants. The Lesikars concede that the funds Werley held in trust for payment of Harriet's share of accounting costs were not paid to the accountants, but they contend that Harriet cannot be held liable for the failure to pay them. They argue in part that the funds are still being held in trust, and that there is no evidence that Harriet spent the funds. We sustain the point on this ground.

While there may be evidence that Werley and Harriet were obligated to pay the funds to the accountants but failed to do so, we agree that there is no evidence that Harriet spent the funds. Jenny has pointed out no evidence, and we have found none, showing that Harriet actually spent the funds held in trust. The only question on which the actual damages award for unpaid income tax return preparation expenses could have been based was question 1(e), which was a pointed question, asking specifically whether Harriet breached her fiduciary duty "in *spending* funds deposited with her agent in trust for payment of professional accounting costs of the estate" (emphasis added). Because we find no evidence that Harriet actually spent the funds, we reform the judgment to delete Jenny's recovery of $1,750.00 for unpaid estate income tax preparation expenses.

## PUNITIVE DAMAGES

In findings 1 through 5 and 12, the jury found that Harriet breached her fiduciary duty, that both Harriet and Lyn committed fraud and engaged in a conspiracy, and that Lyn acquired operation of the lease by deception and intentionally interfered with an operating agreement. Based on the conduct it found in questions 1 through 5 *or* 12, the jury awarded actual damages. Based on that same conduct, the jury awarded $2,000,000.00 in punitive damages against Lyn. Based on the conduct it found in Questions 1, 3, *or* 4 (breach of fiduciary duty, fraud, and conspiracy), the jury awarded $500,000.00 in punitive damages against Harriet, which the trial court reduced to $200,000.00. The Lesikars contend that the trial court erred in awarding any punitive damages because 1) there are defects in the actual damages awards and the theories of recovery underlying the punitive damages awards, and 2) Texas procedures for assessing punitive damages violate due process protections. In the alternative, they contend that the punitive damages awards are excessive.

### Defective Basis Supporting Punitive Damages

The Lesikars contend that there must be an award of actual damages in tort before an award of punitive damages is proper, and further that the actual damages awards here were not awarded in tort, so we must reverse the punitive damages awards. Citing *Lovelace v. Sabine Consol., Inc.*, 733 S.W.2d 648, 654–55 (Tex. App.-Houston [14th Dist.] 1987, writ denied), they also contend that there must be a finding of liability on a theory of recovery that supports punitive damages, and further, because the punitive damages question was asked in the disjunctive, we must reverse the punitive damages awards if any one of the theories of recovery in questions 1 through 5 or 12 cannot support punitive damages. We overrule these contentions.

 The Lesikars first contend that none of the actual damages awards was awarded in tort, which defeats the punitive damages recovery. However, the trial court granted Jenny's plea to impose a constructive trust on the interest in wells 2 and 5 that the Lesikars wrongfully ac-

quired. We disagree that a defect in the actual damages awards would defeat the punitive damages awards in this case, because a wholly independent ground for the recovery of punitive damages exists. *See Lovelace v. Sabine Consol., Inc.* 733 S.W.2d at 654–55.

■■■ Generally, there must be an award of actual damages in tort before an award of punitive damages is proper. *See Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). But the Supreme Court has authorized the recovery of punitive damages in actions sounding in equity, even where there is no award of typical actual damages. *See Nabours v. Longview Sav. & Loan Ass'n,* 700 S.W.2d 901, 904 n. 3 (Tex.1985); *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 584. In *Holloway,* the plaintiff corporation elected to sue for the profits gained by the defendants in breach of their fiduciary duties. *See Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 584. In upholding an award of punitive damages, the Supreme Court stated,

> It is consistent with equitable principles for equity to exact of a defaulting corporate fiduciary not only the profits rightfully belonging to the corporation but an additional exaction for unconscionable conduct. There should be a deterrent to conduct which equity condemns and for which it will grant relief.

*Id.* at 584. In *Nabours,* the Supreme Court rejected the contention that a mere grant of injunctive relief will support an award of punitive damages, but stated its holding "should not be confused with an absolute refusal to allow punitive damages in a case where equitable relief is had." *See Nabours v. Longview Sav. & Loan Ass'n,* 700 S.W.2d at 905. Recognizing a "recovery of property" exception to the rule requiring actual damages, the court stated, "[W]here equity requires the return of property, this 'recovery of the consideration paid as a result of fraud constitutes actual damages and will serve as a basis for the recovery of exemplary dam-

ages.'" *See Nabours v. Longview Sav. & Loan Ass'n,* 700 S.W.2d at 904 (quoting *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 568). We note that in a recent court of appeals case, *Procom Energy L.L.A. v. Roach,* although the equitable relief did not pertain to the *return* of property, the court held that a lack of finding of actual damages did not preclude an award of punitive damages to an operator who recovered a constructive trust on an overriding royalty interest acquired by a gas producer, because of fiduciary-breach and fraud relating to the gas producer's promise to jointly acquire interest in the property and its subsequent failure to convey the interest. *See Procom Energy L.L.A. v. Roach,* 16 S.W.3d 377, 385 (Tex.App.-Tyler 2000, no pet. h.).

We conclude that the estate's recovery of the interest in wells 2 and 5 based on breach of fiduciary duty and fraud may support an award of punitive damages. The fact that the jury awarded other actual damages for the conduct it found in questions 1 through 5 and 12 does not render punitive damages improper, because the property recovered by the estate is an award of actual damages that will support an award of punitive damages.

■■■ Next, citing *Lovelace v. Sabine Consol., Inc.,* the Lesikars contend that because the punitive damages question was asked in the disjunctive, the punitive damages awards must be reversed if any one of the theories of recovery in questions 1 through 5 or 12 cannot support punitive damages. The only theory of recovery the Lesikars fault is the theory in question 1 regarding breach of fiduciary duty. They argue that this theory is incapable of supporting punitive damages because an issue on the requisite intent or malice needed to support a punitive damages award was not submitted to the jury, and it was improper for the trial court to make its own finding on that element.

■■■ In *Lovelace,* the jury found that the defendant had breached two contracts,

breached his fiduciary duty, and committed fraud. The jury then awarded actual damages attributable to the defendant's conduct, without separation of damages according to the theory of liability, whether contract or tort. Finally, the jury awarded punitive damages. The court of appeals reversed the award of punitive damages. *See Lovelace v. Sabine Consol., Inc.,* 733 S.W.2d at 654–55. The court stated:

> An appellant cannot be held accountable for the failure of an appellee to secure separate jury findings upon which an accurate judgment could be based. Nor can an appellate court imply a finding of actual damages in tort, because a court of appeals cannot make original findings of fact; it can only "unfind" facts. For the foregoing reasons, we hold that the trial court erred in awarding punitive damages where there was no independent finding of actual damages in tort.

*Id.* at 655 (citations omitted). Our case is somewhat different from *Lovelace,* because here, the court awarded a constructive trust for the conduct it found in questions 1 through 5 or 12, which amounts to actual damages, which in turn support punitive damages. However, we agree that punitive damages may not be sustained where one of the theories of recovery on which punitive damages were disjunctively awarded does not support punitive damages.

 A defendant's intentional breach of fiduciary duty is a tort for which a plaintiff may recover punitive damages. *See Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 583–84; *Hawthorne v. Guenther,* 917 S.W.2d at 936; *InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 907 (Tex.App.-Texarkana 1987, no writ). While it is a general rule that Texas courts allow the recovery of punitive damages where the defendant, in committing a tort, acted willfully, maliciously, or fraudulently, where punitive damages are awarded for breach of fiduciary duty the actual motives of the defendant and whether the defendant acted with malice are immaterial. But something more than a simple breach is required for the recovery of punitive damages; the acts constituting the breach must have been fraudulent, or at least intentional. *See Int'l Bankers Life Ins. Co. v. Holloway,* S.W.2d at 584; *InterFirst Bank of Dallas, N.A. v. Risser,* 739 S.W.2d at 907. An intentional breach may be found where the fiduciary intends to gain an additional benefit for himself. *See Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d at 583–84. In *Holloway,* the Supreme Court suggested that willful and fraudulent acts are presumed when the fiduciary, as in *Holloway,* gains an additional benefit for himself as a result of his breach. In *Texas Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980), the Supreme Court held that exemplary damages are proper when self-dealing by a fiduciary has occurred. Where, as here, a fiduciary in fact gains a benefit by breaching her fiduciary duty, willful and fraudulent acts may be presumed. In fact, the jury found that Harriet breached her fiduciary duty *and* committed fraud. There was no evidence of any conduct amounting to fraud apart from the conduct found to be a breach of Harriet's fiduciary duty. Thus, the same conduct underlying the finding of breach also amounted to fraud.

### Omitted Element in the Charge

 Question 1 asked whether Harriet breached her fiduciary duty in various respects. No question asked whether Harriet acted intentionally, willfully, or fraudulently, or whether she intended to gain an additional benefit for herself. In its final judgment, the trial court supplied the alleged omitted element, finding not only that Harriet engaged in conduct in breach of her fiduciary duty but also that she did so willfully and maliciously. Even if a question on intent were required in this case, the Lesikars have failed to preserve the error.

 Where a jury awards damages based on a charge that omits an element

necessary to sustain a ground of recovery, the trial court may either file a written finding regarding the missing element, or may render judgment without one. If the trial court does not file a written finding, the omitted element is deemed found in support of the judgment so long as no objection was made or issue requested, and the evidence supports such a finding. *See* Tex.R. Civ. P. 279; *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 436 (Tex.1995).

The Lesikars contend that the trial court's finding of willfulness and malice was improper because of the Texas Supreme Court's holding in *Martin v. McKee Realtors, Inc.,* 663 S.W.2d 446 (Tex.1984). In that case, the trial court awarded discretionary damages under the DTPA where the plaintiffs obtained a jury finding that the defendants acted "knowingly," a requirement for the recovery of discretionary damages under the DTPA, but where they failed to request a jury issue on discretionary damages. The plaintiff-appellees contended that since the "knowingly" issue had been submitted to the jury, it was proper under Texas Rule of Civil Procedure 279 for the issue of punitive damages to have been deemed found in support of the discretionary damages award. In rejecting this argument, the Supreme Court noted a court of appeals case, *Holland v. Lesesne,* 350 S.W.2d 859 (Tex.Civ. App.-San Antonio 1961, writ ref'd n.r.e.), wherein punitive damages were held to be in the nature of an independent theory of recovery and could not be awarded absent a special issue thereon. The court then held that a plaintiff seeking to recover discretionary damages under the DTPA must request a jury issue on such damages to avoid waiver of the recovery of those damages. *See Martin v. McKee Realtors, Inc.,* 663 S.W.2d at 448.

*McKee* does not parallel the present situation. Here, a question on punitive damages, being in the nature of an independent ground of recovery, was submitted, but a question on an aggravating factor

necessary to sustain a heightened damage award was omitted. In *McKee,* the Supreme Court cited *Holland* in support of its statement that a trial court may not make findings of fact where the omitted issue is an independent ground of recovery. In *Holland* the San Antonio Court of Appeals held that a finding that the conversion was either malicious or willfully done, essential to a recovery of punitive damages, was the plaintiff's issue, and that the issue was waived in the absence of a request by the plaintiff for submission of the issue. *See Holland v. Lesesne,* 350 S.W.2d at 865.

Despite the Supreme Court's citation to *Holland,* more recent holdings of the Supreme Court suggest that the trial court may make a finding of intent when an issue on it is omitted, if an issue on punitive damages is submitted. In *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d at 437, the Supreme Court stated that the trial court, in expressly excluding the award of mental anguish damages where the jury awarded them without finding that the defendant acted knowingly, must not have found that the defendant acted knowingly, although the trial court could have so found under Rule 279. In *Ramos v. Frito-Lay, Inc.,* 784 S.W.2d 667, 668 (Tex. 1990), the court held that although the jury awarded punitive damages despite finding that the appellee was acting in his managerial capacity, the finding would be deemed found since there was no objection. In addition, the Beaumont Court of Appeals squarely addressed the issue presented here and held that where punitive damages were awarded for breach of fiduciary duty, but the issue of intent, self-dealing, or malice necessary to support the award was omitted, the defendant was required to object to the omission under Rule 279, and failing to do so, the element could be deemed found under Rule 279. *See Hawthorne v. Guenther,* 917 S.W.2d at 936.

We hold that even if the submission of a question of intent was required in this

case, the submission of the punitive damages question along with the submission of the issue of breach of fiduciary duty required the Lesikars to object to the omitted issue of intent. *See* Tex.R. Civ. P. 279; *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d at 437; *Ramos v. Frito–Lay, Inc.,* 784 S.W.2d at 668; *Hawthorne v. Guenther,* 917 S.W.2d at 936. Pursuant to Rule 279, where a ground of recovery consists of more than one element, and one or more essential elements necessarily referable thereto are submitted and found by the jury, but one element is omitted, that element may be found by the court or may be deemed found in support of the judgment if the opposing party does not object to its omission or request an issue thereon, and there is factually sufficient evidence to support the omitted finding. Tex.R. Civ. P. 279. The Lesikars failed to object or request an issue, so the trial court could properly find the omitted element if there is sufficient evidence to support it. *See id.; State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d at 437. Without detailing again the evidence supporting fraud, we find there is sufficient evidence to support the court's finding.

### Due Process

The Lesikars contend that Texas procedures for reviewing punitive damages violate constitutional due process protections, specifically because (1) Texas trial courts are not required to affirmatively justify the punitive awards on the record and (2) the Texas Supreme Court does not consider the excessiveness of punitive damage awards, but considers only whether courts of appeals applied an erroneous standard of review. We overrule this contention.

The United States Supreme Court has held that due process imposes constraints on the size of punitive damages awards and on the procedures under which punitive damages are awarded and reviewed. *See Honda Motor Co. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Court's recent opinions, however, do not provide specific due process guidelines for lower courts to follow. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 12 n. 1, 27 (Tex.1994). Instead, the Court has simply evaluated the constitutionality of punitive damages awards on a case-by-case basis, holding that certain states' procedures in a given case either violate or comport with due process. *See Honda Motor Co. v. Oberg,* 512 U.S. at 432, 114 S.Ct. 2331 (holding that Oregon's procedure, which failed to provide any post-verdict review of the amount of punitive damages, was unconstitutional); *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. at 465, 113 S.Ct. 2711 (upholding the award as constitutional); *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. at 23–24, 111 S.Ct. 1032 (upholding the award as constitutional). In *Haslip,* the Court advised, "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. at 18, 111 S.Ct. 1032.

The Texas Supreme Court in *Moriel,* in remanding the case for retrial, considered it advisable to articulate procedural standards for the trial courts to be applied to all subsequent punitive damages cases in Texas. *See Transp. Ins. Co. v. Moriel,* 879 S.W.2d at 26. The *Moriel* case contains our current procedural standards. Because it had no "bright line guidance" from the Supreme Court, the court compared Texas procedures to the procedures examined by the Supreme Court in *Haslip* and *TXO Production.* The court concluded that our procedures did not compare favorably. It recognized as disparate that Texas trial courts, unlike other courts, are not required to scrutinize each award and set forth reasons on the record for refusing to disturb a jury verdict. In addition, our

Supreme Court, unlike its counterparts in other states, is precluded from reviewing the evidence supporting a punitive damages award for factual sufficiency. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d at 28.

In *TXO Production*, the Supreme Court analyzed punitive damages in a case where the trial court had not articulated on the record its reasons for denying motions for judgment notwithstanding the verdict and for remittitur. Although the Court stated that it is always helpful for trial courts to explain the basis for their rulings, it held that this failure was not a constitutional violation. *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. at 465, 113 S.Ct. 2711. The *Moriel* court also addressed the Lesikars' first argument. It recognized that other jurisdictions expressly require the trial court to articulate its reasons for refusing to disturb a punitive damages award, most adopting them after *Haslip*. In addition, it observed that several federal appellate courts reviewing punitive damages awards since *Haslip* have remanded the cases to the trial court with instructions to articulate the reasons for upholding the award. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d at 32. But, rather than make this a requirement, the court noted that such findings would obviously be helpful and urged that they should be made to the extent practicable. *Id.* at 33.

With regard to the argument that our Supreme Court does not consider the excessiveness of punitive damages awards, the *Moriel* court noted that while our punitive damages awards are scrutinized less closely on appeal to the highest court than in other states, due process does not require two levels of appellate review. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d at 29. We note that the question of excessiveness is purely a factual inquiry and is beyond the Texas Supreme Court's jurisdiction and that the court has jurisdiction to determine only whether the courts of appeals properly review such factual inquiries. *See Ellis County State Bank v. Keever*, 915 S.W.2d 478, 479 (Tex.1995); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). However, it is significant that the Texas Supreme Court also has jurisdiction to evaluate punitive damages awards in light of constitutional substantive due process claims, as in this case. *See Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex.1998).

To address the disparities and bring Texas procedure in line as providing adequate procedural safeguards to protect against grossly excessive awards, the *Moriel* court made the following two changes: It adopted the requirement, upon request, of bifurcated trials in punitive damage cases, and held that the court of appeals, when conducting a factual sufficiency review of a punitive damages award, must detail the relevant evidence explaining why that evidence either supports or does not support the award. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d at 31. Several courts of appeals have held that this heightened post-judgment procedure for reviewing punitive damages awards mandated by *Moriel* satisfies due process. *See Convalescent Servs., Inc. v. Schultz*, 921 S.W.2d 731, 740 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *I–Gotcha, Inc. v. McInnis*, 903 S.W.2d 829, 844–45 (Tex.App.-Fort Worth 1995, writ denied). Since *Moriel*, the United State Supreme Court has held that Oregon's post-verdict procedures for reviewing punitive damages violated due process. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336. The procedure in Oregon, however, was significantly dissimilar to the procedure in Texas, and the holding in that case would not require that we find Texas procedures unconstitutional. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336; *see also Convalescent Servs., Inc. v. Schultz*, 921 S.W.2d at 740.

In light of the United States Supreme Court's holdings, the Texas Supreme Court's reasoned opinion in *Moriel*, and the decisions of other courts of appeals, we

hold that current Texas procedures do not offend constitutional due process protections.

### Excessiveness

The Lesikars contend not only that the trial court erred in awarding punitive damages, but also that the punitive damages awards are excessive. We have overruled their first contention, but we agree that the punitive damages awards are excessive.

 Punitive damages must be reasonably proportional to actual damages, although there can be no set ratio between actual and punitive damages that will be considered reasonable. *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d at 909. The amount of punitive damages is largely within the jury's discretion. We may reverse a punitive damage award or suggest a remittitur only if we determine the evidence supporting the award is factually insufficient or the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d at 30; *see also Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

 Whether an award of punitive damages is excessive is measured by the factors set out in *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d at 910. Those factors include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d at 910.

 In order to assess the reasonableness of a punitive damages award, we are required to detail the relevant evidence and explain why the evidence either supports or does not support the punitive damages award. *Ellis County State Bank v. Keever*, 888 S.W.2d at 798; *Transp. Ins. Co. v. Moriel*, 879 S.W.2d at 31.

 Assessing the criteria set out in the *Kraus* case, we find that the $2,000,000.00 punitive damages award against Lyn is excessive. The loss experienced by the estate and Jenny because of Lyn's acts was purely financial, and in the judgment as we reform it, they will fully recover their financial loss and more. Unlike personal injury cases where monetary damages cannot replace a lost life or restore a maimed body, the actual recovery in this case will make the injured parties completely whole. There was no mental or physical abuse, personal outrage, insult, or opprobrious conduct. Lyn's acts were not calculated to injure anyone's personal sensibilities, and Jenny certainly had not reposed any personal trust in Lyn. In fact, the parties have been adversaries feuding and litigating for nearly fifteen years over their family property. Lyn's motive was financial, not spite. Considering the positions of the parties and the ongoing legal disputes involving them and their property, a $2,000,000.00 punitive damages award against Lyn appears to be the result of passion rather than the result of an objective assessment of the evidence. *See InterFirst Bank of Dallas, N.A. v. Risser*, 739 S.W.2d at 909–10 (Cornelius, C.J., concurring). We will therefore suggest a remittitur of $1,400,000.00 of the punitive damages award against Lyn, leaving the punitive damages against him at $600,000.00.

### ADDITIONAL ERRORS IN THE JUDGMENT

 The Lesikars contend that the judgment contains additional errors. Specifically, they complain of the trial court's order granting a temporary injunction keeping Lyn from being operator on the T.W. Lee lease, as well as that part of the judgment that confirms L & G, Jenny, and Fay as the current operators of the lease.

In August of 1994, Harriet, in her capacity as co-independent executrix of the Lewis estate, submitted a "P–4" form to the Railroad Commission seeking to

change the operator of the T.W. Lee oil lease on Commission records from L & G to Lyn. The Railroad Commission approved the change. In November of 1994, Jenny appealed to the Railroad Commission, arguing that Harriet did not have authority to file the application. The Railroad Commission disagreed with Jenny and decided that she did not satisfy her burden of showing that she had a good-faith claim to operate the lease and that Lyn did not. Jenny appealed to the trial court in this case seeking a temporary injunction against Lyn. The court granted a temporary restraining order, pursuant to which L & G has been operating the lease to date. The Lesikars now contend that the trial court erred both in granting the temporary restraining order and in stating that Jenny is the operator of the lease; they request that we set that part of the judgment aside. They argue that these rulings amount to impermissible collateral attacks on a Railroad Commission ruling. We agree.

Section 85.241 of the Natural Resources Code sets out the procedure for appealing from a Railroad Commission ruling. That section provides:

> Any interested person who is affected by the conservation laws of this state or orders of the commission relating to oil or gas and the waste of oil or gas, and who is dissatisfied with any of these laws or orders, may file suit against the commission or its members in a court of competent jurisdiction in Travis County to test the validity of the law or order.

TEX. NAT. RES.CODE ANN. § 85.241 (Vernon 1993). Jenny has not addressed this provision or stated that she followed this procedure. Instead, she sought a temporary injunction against Lyn in the trial court below, and sought to have the ruling permanently set aside. These amount to collateral attacks.

 A collateral attack on a judgment is an attempt to avoid its binding force in a proceeding not instituted for the purpose of correcting, modifying, or vacat-

ing it, but in order to obtain some specific relief against which the judgment stands as a bar. Our Court in recent opinions has held that the rules concerning collateral attack apply to orders or judgments of quasi-judicial bodies, such as the Railroad Commission, as well as to the courts. *Arkla Exploration Co. v. Haywood, Rice & William Venture,* 863 S.W.2d 112 (Tex. App.-Texarkana 1993, writ dism'd by agr.). The exception to the general rule is that a collateral attack upon an agency order may be maintained successfully on one ground alone-that the order is void. An agency order may be void in the requisite sense on either of two grounds: 1) the order shows on its face that the agency exceeded its jurisdiction, or 2) a complainant shows that the order was procured by extrinsic fraud. *Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates,* 883 S.W.2d 739, 758 (Tex.App.-Austin 1994) (Powers, J., dissenting), *rev'd on other grounds,* 947 S.W.2d 887 (Tex.1997). Neither of these exceptions applies in this case. We therefore hold that the trial court was without authority to circumvent Railroad Commission authority, and we reform the judgment to delete that part of Jenny's recovery.

## ATTORNEYS' FEES

Jenny sought attorneys' fees at law or in equity, and/or pursuant to Sections 37.001 and 38.001 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. §§ 37.001, 38.001 (Vernon 1997). Section 37.001 is the Declaratory Judgments Act, and Section 38.001 allows the recovery of attorneys' fees for various claims. The trial court submitted a broad attorney-fee question to the jury: "What is a reasonable fee for the necessary services of Jenny Lou Lewis Rappeport's attorney in this case, stated in dollars and cents?" The jury answered $253,444.00. The Lesikars contend that while Jenny's claim for declaratory judgment will support attorneys' fees, her remaining tort claims will not. Thus, they contend that the court

erred in awarding attorneys' fees because Jenny failed to segregate her fees among her various claims or offer proof that her claims are sufficiently interrelated or so incapable of segregation that she should be excused from segregating them. Jenny contends that the Lesikars have waived the alleged error. The Lesikars respond, arguing that they have preserved error because their appellate position is not that Jenny failed to segregate, but that there is legally insufficient evidence that her claims are interrelated, which they have preserved in their post-verdict motions. We reject the Lesikars' distinction and hold that the error has been waived.

 As a general rule, a party seeking to recover attorneys' fees carries the burden of proof to establish that he is entitled to them. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991). When a plaintiff seeks to recover attorneys' fees in a case in which he asserts multiple claims, at least one of which supports an award of fees and at least one of which does not, as the Lesikars contend is the case here, the plaintiff must offer evidence segregating attorneys' fees among his various claims. *See id.* at 10–11. An exception to this duty to segregate arises when the attorneys' fees are in connection with claims arising out of the same transaction and are so interrelated that their award or denial depends essentially on the same facts. In that circumstance, segregation is not required. *Id.* at 11; *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 624–25 (Tex.App.-Dallas 1987, writ denied). Thus, a plaintiff must either segregate his fees among his claims or establish that his claims are sufficiently interrelated.

 Jenny's attorney, Jerry Harris, testified to the hours worked and the hourly rate of several attorneys who worked on Jenny's behalf, and the amount he calculated corresponded to the amount awarded. The Lesikars failed to object to his testimony on the basis that Jenny failed to segregate fees among her various claims.

Furthermore, although the Lesikars recognize in their brief that without legally sufficient evidence that the claims are interrelated a jury finding of the amount of Jenny's fees is immaterial, the Lesikars failed to object to the submission of the broad attorney-fee question. As a result of these failures, they have waived their complaint in this regard. Where no objection is made to the failure to segregate attorneys' fees, either at the time evidence of attorneys' fees is presented or to the charge, the error is waived. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997); *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex.1988); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d at 11 (stating that remand is appropriate "[i]f a party refuses, *over objection*, to offer evidence segregating attorney's fees among various claims or parties, and an appellate court determines that segregation was required" (emphasis added), and providing that an objection to the failure of the trial court to allocate or segregate the fees in the jury charge is sufficient to preserve error); *see also* TEX.R. CIV. P. 274.

The Lesikars say their argument is not that Jenny *failed to segregate* but that she failed to offer proof that her claims are interrelated, which they may assert in post-verdict motions. These arguments are effectively the same. The rule requiring segregation and the exception requiring proof that the claims are interrelated have been called "corollary" rules. *See 4M Linen & Unif. Supply Co. v. W.P. Ballard & Co.*, 793 S.W.2d 320, 327 (Tex. App.-Houston [1st Dist.] 1990, writ denied); *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d at 624–25. Indeed, the Lesikars' attempt to distinguish the arguments fails because they ultimately state, "*where plaintiffs refuse to segregate attorneys' fees*, Texas courts routinely deny any fee recovery" (emphasis added).

Where the appellant has waived the error, a trial court may disregard the jury finding only if it is unsupported by the evidence or it is immaterial. *Green Int'l, Inc. v. Solis*, 951 S.W.2d at 389–90 (citing *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d at 157); *Norrell v. Aransas County Navigation Dist. No. 1*, 1 S.W.3d 296, 303–04 (Tex.App.-Corpus Christi 1999, pet. dism'd). The jury awarded $253,444.00 in attorneys' fees. This finding was material and was supported by the uncontroverted testimony of Jenny's attorney. We, therefore, overrule the Lesikars' point and hold that Jenny may recover these attorneys' fees.

## THE WERLEY SUMMARY JUDGMENT

In 1994, Jenny amended her pleadings to add Werley as a counter-defendant asserting claims against Werley for civil conspiracy, negligent misrepresentation, and breach of fiduciary duty. Werley moved for summary judgment, which the trial court granted. Jenny has filed a cross-appeal complaining of the trial court's rendition of the adverse summary judgment on her counterclaims against Werley.

To prevail on a motion for summary judgment, a movant must establish that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). Summary judgment for a defendant is proper when he negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999). We indulge every reasonable inference and resolve any doubt in the nonmovant's favor. On appeal, the movant still bears the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.

## Conspiracy

Jenny contends that Werley engaged in a conspiracy with Lyn and Harriet to defraud her of her interest in reimbursement for the overpayment to Clark, Thomas. She also contends that Werley conspired with Harriet to assist her in breaching her fiduciary duties to the estate. We have set out the elements of civil conspiracy above. They are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d at 933.

In his summary judgment motion and on appeal, Werley contends that (1) an attorney cannot conspire with his client; (2) he did not commit an underlying fraudulent act on which conspiracy could be based; (3) Lyn and Harriet did not commit an underlying fraud or breach of fiduciary duty and, therefore, could not have conspired with him to engage in those activities; and (4) Jenny did not suffer any damage.

Regarding Werley's first contention, we hold that an attorney may be liable for conspiracy to defraud if he knowingly agrees with others to defraud a third person. *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex.App.-Houston [1st Dist.] 1985, no writ). Regarding his second contention, even if Werley did not commit a fraudulent act, he could be liable for conspiring to assist the Lesikars in perpetrating their fraud. *Bernstein v. Portland Sav. & Loan Ass'n*, 850 S.W.2d 694, 709 n. 12 (Tex.App.-Corpus Christi 1993, writ denied), *overr. on other grounds*, *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex.2000). Regarding his third contention, we have already held that there is sufficient evidence to support the jury's findings that Lyn and Harriet committed fraud.

## Breach of Fiduciary Duty and Negligent Misrepresentation

Jenny contends that Werley negligently misrepresented material facts to

her and that those misrepresentations damaged her. In *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787 (Tex.1999), the Texas Supreme Court recognized a cause of action for negligent misrepresentation against an attorney by a nonclient. In this case, Jenny contends that the misrepresentations originate from Werley's failure to disclose certain information, i.e., that Lyn was acquiring Clark, Thomas's interest in wells 2 and 5.

Werley contends that he had no duty to Jenny. He argues that the duty an attorney has in this context does not extend to a plaintiff, like Jenny, on the opposing side of litigation. He also contends that there was no duty because the misrepresentation, if any, was not material and was not such that Jenny was justified in relying on it.

In *McCamish,* the court outlined the scope of the duty imposed on an attorney to a nonclient. Relying on RESTATEMENT (SECOND) OF TORTS § 552(2) (1977), the court held that the duty arises when (1) the attorney is aware of the nonclient and intends that the nonclient rely on the representation, and (2) the nonclient justifiably relies on the attorney's representation of a material fact. For purposes of determining whether there is justifiable reliance, a reviewing court must consider the nature of the relationship between the attorney, client, and nonclient.

Jenny contends that Werley made misleading statements to her attorney that nothing was happening with respect to Lyn's effort to acquire the Clark, Thomas interest. She alleges that Werley also denied contacting Clark, Thomas on Lyn's behalf. She contends Werley later admitted sending an assignment to Clark, Thomas, but denied having heard anything from them about it. Within thirty days of these statements, the assignment from Clark, Thomas to Lyn was consummated. Jenny further contends that after completing the assignment arrangement, Werley misrepresented the terms of the assignment to her attorney.

Taking all of these assertions as true, we hold that Werley did not have a duty to Jenny. This case is distinguishable from *McCamish,* which occurred in a transactional, as opposed to a litigation, setting. In this case, the parties had engaged in numerous, protracted suits. The summary judgment evidence reveals, and Jenny admits, that she was aware that Clark, Thomas was interested in settling the overpayment claim and had contacted each of the co-executrices. Under these facts, she was not justified in relying on Werley's statements, even if they were material and Werley intended that she rely on them.

■ Jenny also contends that Werley misrepresented material facts by failing to disclose information when he had a duty to speak. She argues that as the attorney for the estate representative, he had a duty to disclose that the estate could recover the Clark, Thomas interest, a thing of value. She also contends that Werley had a duty to disclose the extent to which Lyn was attempting to acquire the Clark, Thomas interest. She says she was harmed by her agreement to close the estate, which was based on her belief that the issue of the estate's claims against Clark, Thomas for overpayment would be severed out for further proceedings.

For there to be actionable nondisclosure fraud, there must be a duty to disclose. *Bradford v. Vento,* 997 S.W.2d at 725. Whether such a duty exists is a question of law. *Id.* A duty to disclose may arise in four situations: (1) when one is in a fiduciary relationship; (2) when one voluntarily discloses some information, but not all of the pertinent information; (3) when new information makes an earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression.

■ Nevertheless, an attorney has no duty to reveal information about a client to a third party when that client is

perpetrating a nonviolent, purely financial fraud through silence. *Bernstein v. Portland Sav. & Loan Ass'n,* 850 S.W.2d at 704. When an attorney does make misrepresentations on behalf of a client, the general standard for fraud applies. But the attorney has no duty to correct representations that prove to be false. *Id.* We hold that Werley did not have a duty to disclose this fact to Jenny or to correct any representation that proved to be false.

Jenny contends that, by assisting Lyn in acquiring the Clark, Thomas interest, Werley breached his fiduciary duty to the estate beneficiaries "to collect for them any money or other thing of value that might have been received in settlement of the overpayment claim against Clark, Thomas." She predicates the imposition of a duty on Werley's duty to Harriet, and Harriet's duty as co-executrix.

As Jenny candidly admits, however, there are Texas cases holding that a third party does not have a cause of action in negligence against an attorney when there is a lack of privity. *See, e.g., Thompson v. Vinson & Elkins,* 859 S.W.2d 617, 621 (Tex.App.-Houston [1st Dist.] 1993, writ denied). She argues for an extension of the law under the facts of this case because of the symmetry between each co-executrix's duties and responsibilities. Privity arises, she contends, because in prosecuting a claim for the estate, the attorney has the same duty he would have if employed by the other co-executrix to recover what is owed to the estate. She contends that, in the absence of this privity, one co-executrix cannot protect herself from the fraud of the other.

In making this argument, however, Jenny blurs the respective roles of an executrix and her attorney. The executrix's duty is to prosecute claims on behalf of the estate; the attorney's duty is to give the executrix candid legal advice. The executrix is liable for breach of fiduciary duties to the beneficiaries; the attorney is liable for breach of fiduciary duties to the executrix.

Co-executrices may have the same duties, but their opinions may differ about how best to fulfill those duties. Candid advice from an attorney is invaluable in weighing those competing options. We see no reason to risk diluting the value of that advice by requiring the attorney of one co-executrix to effectively represent the other co-executrix. Each co-executrix can protect herself adequately by entering into a joint representation arrangement with a single attorney where appropriate, or by employing her own attorney. We conclude that the trial court properly granted summary judgment for Werley.

## CONCLUSION

For the reasons stated, we modify the trial court's judgment to delete Jenny Rappeport's recovery of $12,000.00 as costs and $1,750.00 awarded by the jury as unpaid accounting expenses in answer to questions 14(1) and 14(4), and to delete the recovery by Jenny of the "overpayment," $298,547.00 according to the jury's answer to question 10(a). We also modify the judgment to correct the constructive trust recovery to cover all of the Clark, Thomas working interest in wells 2 and 5, rather than the interest shown in the judgment as it now stands. We also modify the judgment to delete the award of an injunction against Lyn with regard to the operations of the lease, and to eliminate the provision of the judgment restoring Jenny to the position of operator. We further modify the judgment to award Jenny $38,245.22 as prejudgment interest rather than the amount contained in the judgment. We will affirm the judgment as modified if Jenny, within fifteen days from the date of our opinion, files a remittitur of $1,400,000.00 from the punitive damages awarded her against Lyn Lesikar. If Jenny fails to file such a remittitur, the judgment will be reversed, and the cause will be remanded for a new trial.

Concurring opinion by Justice GRANT.

BEN Z. GRANT, Justice, concurring.

I would recommend that the Legislature revisit Section 240 of the Probate Code, Joint Executors or Administrators. TEX. PROB.CODE ANN. § 240 (Vernon 1980). I would strongly suspect that most of the time when joint executors are named in a will, the testator intends that these joint executors will be a check on each other. As this case indicates, it does not work that way. Section 240 provides that the executors (or administrators) may act independently of each other. This creates a hydra-headed administration of the estate in which there is no guarantee that there will not be a duplication of effort, as well as each being able to hire an attorney to be paid out of the estate which would result in double attorneys' fees. (The only exception under Section 240 that requires the signatures of all executors or administrators is in the conveyance of real estate.) I would recommend Section 240 be amended to require that the joint executors or administrators act jointly on all matters involving the estate.

My next concern is in the construction of the law that the attorney retained by an executor or administrator does not represent the estate, but rather represents the executor or administrator. *See Huie v. DeShazo*, 922 S.W.2d 920 (Tex.1996).

The court in the *Huie* opinion cited a study that recommended the following:

> The fiduciary's duty is to administer the estate or trust for the benefit of the beneficiaries. A lawyer whose assignment is to provide assistance to the fiduciary during the administration is also working, in tandem with the fiduciary, for the benefit of the beneficiaries, and the lawyer has the discretion to reveal such information to the beneficiaries.... [2]

2. Based on "a study by the Section of Real Property, Probate and Trust Law of the American Bar Association entitled *Report of the*

On the basis of precedent, the Texas Supreme Court declined to adopt the approach recommended by this study.

Because most beneficiaries do not have their own attorney and rely on the attorney handling the estate to see that it is properly administered according to law, I would recommend that the Supreme Court consider changing the legal obligation in accordance with the recommendations in the report.

## ON MOTION FOR REHEARING

CORNELIUS, Chief Justice.

S. Gary Werley and the law firm of Bishop, Payne, Williams & Werley, L.L.P. (collectively, Werley) have filed a motion for rehearing in which they contend that we should clarify our judgment to reflect that no costs on appeal are assessed against Werley. The judgment in the case reads, "It is further **ORDERED** that the parties each pay one half of the costs incurred by reason of this appeal." We intended that costs be divided equally between Jenny and the Lesikars. We therefore modify our judgment to provide that Jenny Rappeport and the Lesikars each pay one half of the costs incurred by reason of this appeal.

The Lesikars have also filed a motion for rehearing in which they contend we erred in holding that they failed to preserve error on the issue of attorneys' fees. We held that the Lesikars waived any error with respect to attorneys' fees by failing to object to Jenny's attorney's testimony on the ground that she failed to segregate the fees among her various claims. We also found that they failed to object to the submission of the broad attorneys' fee question. We further held that the trial court could only disregard the jury finding if it was unsupported by the evidence or was immaterial, neither of which we found.

*Special Study Committee on Professional Responsibility–Counselling the Fiduciary. See* 28 REAL PROP., PROB. & TR. J. 823 (1994)."

In their motion for rehearing, the Lesikars cite to the reporter's record showing where they objected to the jury charge. Nevertheless, their contention on rehearing must be viewed within the context of their appeal. In their initial brief on appeal, they contended there was no evidence or insufficient evidence that Jenny's claims were sufficiently intertwined to avoid the requirement that attorneys' fees be segregated among her various claims. Jenny responded that the Lesikars failed to preserve error because they failed to object to the evidence or to the jury charge. In their reply brief, the Lesikars reasserted their no evidence and insufficient evidence contentions with citations to their post-verdict and post-judgment motions, apparently believing that the jury's verdict on attorneys' fees was immaterial without evidence that Jenny's claims were intertwined, and thus their motions preserved error. But unless the Lesikars brought to the trial court's attention Jenny's responsibility to segregate her attorneys' fees or to demonstrate that her claims were too intertwined to segregate them, it does not matter whether there was evidence that her claims were intertwined. Therefore, the Lesikars' argument on rehearing (that they objected to the jury charge) is at variance with their argument on appeal (that there was insufficient evidence that Jenny's claims were intertwined).

Moreover, the Lesikars had the burden to point out specifically in the record where they made the proper objection. TEX.R.APP. P. 38.1(f), (h). The Lesikars' citations to the record were not before this Court on appeal. The appeal involved twenty-six issues, seven briefs totaling over 260 pages, sixteen volumes of the clerk's record, and twenty-five volumes of the reporter's record. Without proper citation to the record, an objection to the charge is difficult to find in the reporter's record, which is not indexed by objection or otherwise. Thus, the issue was improperly briefed.

Even if we were to consider their citations, Jenny's contention that the Lesikars' objection was not plainly stated is persuasive. The Lesikars contend they objected on the grounds (1) that Jenny failed to segregate her request for attorneys' fees, and (2) that there was no evidence regarding segregation. Reviewing their citations to the record, we agree they objected that there was no evidence regarding segregation. But they also were required to object to the broad-form nature of the attorneys' fees question to preserve error on their contention that the jury charge should have segregated the fee request among the claims. The only statement by their attorney that can be construed as an objection to the broad-form nature of the jury charge came when he stated: "As a result, there is no evidence to submit this question to the jury. *And the question itself is not phrased to cover attorneys' fees that would be compensable as a matter of statute.*" (Emphasis added.) The first sentence is clearly a no evidence objection. The second sentence is an objection to the phrasing of the jury charge, but arguably would not have put the trial court on notice of the nature of the objection.

The objection here contrasts with the objection lodged in *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991), where Stewart Title objected, "*[T]here has been no breakdown or allocation* to the— of the fees incurred in connection with this defendant, as well as numerous other defendants, *in order to show what is allocable as a reasonable amount for the prosecution of the suit against the defendant.*" In that case, the objection notified the trial court of Stewart Title's request that the jury be charged to segregate attorneys' fees between defendants. In this case, the Lesikars' attorney's statement must be read in the context of their overall objection, the thrust of which was clearly a complaint about the sufficiency of the evidence regarding whether Jenny's claims were sufficiently intertwined to avoid the segregation requirement. That objection

was insufficient to notify the trial court that Jenny was required to prove that her claims were intertwined in the first place, or that the trial court was required to charge the jury to segregate attorneys' fees among Jenny's claims. We overrule the Lesikars' motion for rehearing.